IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:19-cr-000127 |
| v. | Honorable Leonie M. Brinkema |
| LOURDES TERRAZAS SILES,<br> a/k/a LOURDES TERRAZAS-SILAS, | Motions Hearing: July 5, 2019 |
| Defendant. | |

**SUPPLEMENTAL RESPONSE OF THE UNITED STATES TO
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, Anthony W. Mariano, Special Assistant United States Attorney, and Danya E. Atiyeh, Assistant United States Attorney, hereby submits this supplemental memorandum in opposition to the defendant's motion to dismiss the indictment (hereinafter, the "Motion") and the defendant's supplement in support of the Motion (hereinafter, the "Supplemental Memorandum") filed by defendant Lourdes Terrazas Siles.   For the following reasons, as well as the reasons stated in the response filed by the United States on May 31, 2019, the Court should deny the defendant's Motion.

## ARGUMENT

This case is a routine unlawful reentry prosecution.   The defendant, a native of Bolivia, illegally entered the United States in December 1999 and was removed in January 2000, pursuant to expedited removal proceedings.   Without any legal authority to do so, the defendant reentered the United States and was found in the Eastern District of Virginia in August 2016, after she was arrested for her aggravated sexual battery of her daughter for over six years.   The indictment

1

presents these facts, and the United States is prepared to prove them beyond a reasonable doubt with credible evidence.

In her Motion and Supplemental Memorandum, the defendant tries to distract the Court from the straightforward nature of the case. The defense claims that the uploading of fingerprints to a government database constitutes an "encounter," and thus the prosecution is untimely. The defense complains that the United States has not met its discovery obligations sufficiently ahead of its deadlines. The defendant says that because she may not have signed the back of a form—a form that she was personally served—that her due process rights have been violated, and the case must be thrown out. Finally, the defendant tells the Court to ignore the statutory text: an expedited removal does not constitute an "entry," and, therefore, there can be no reentry. None of these arguments are supported by either the facts or the law. The Court should deny the defendant's Motion and allow the United States to prove its case at trial beyond a reasonable doubt.

## I.   The Defendant's Statute of Limitations Argument Fails Because the Record Demonstrates She Was "Found In" the United States in August 2016.

### A.   The Defendant Bears the Burden of a Statute of Limitations Defense.

This Court has held that, in the prosecution of Section 1326(a) offenses, "[t]he statute of limitations is an affirmative defense in which the defendant bears the burden." *United States v. Merentes-Vargas*, No. CRIM.A. 3:09CR086, 2009 WL 1587291, at \*3 (E.D. Va. June 5, 2009), *aff'd sub nom. United States v. Vargas*, 408 F. App'x 676 (4th Cir. 2011); *cf. Smith v. United States*, 568 U.S. 106, 112 (2013) ("[A]lthough . . . a statute-of-limitations defense can free the defendant of criminal liability, it does not place upon the prosecution a constitutional responsibility to prove that he did not withdraw. As with other affirmative defenses, the burden is on him.").[1]

---

[1] In the opening response, the United States cited the Fourth Circuit's holding that "[t]he

The indictment clearly alleges that "On or about August 19, 2016, at or near Manassas, Virginia, in the Eastern District of Virginia, the defendant LOURDES TERRAZAS-SILAS, an alien, was found in the United States . . . ." [Dkt. Entry 11.]   In a motion to dismiss, "the indictment allegations are presumed to be true."   *United States v. Treacy*, 677 Fed.Appx. 869, 873 (4th Cir. 2017).   Accordingly, a district court should not dismiss an indictment "based upon a determination of facts that will be developed at trial."   *United States v. Lewis*, 262 F. Supp. 3d 365, 368 (E.D. Va. 2017); *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012); *see also United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004) ("To warrant dismissal of the indictment, Thomas would need to demonstrate that the allegations therein, even if true, would not state an offense.").   In general, "[d]ismissal of an indictment is not to be granted except in extraordinary circumstances."   *United States v. Mosley*, 500 F. Supp. 601, 605 (N.D.N.Y. 1980).

This case demonstrates why it is wise that the law requires the defendant bear the burden proving her affirmative defense under the statute of limitations.   Because the dates the defendant cites are nothing more than references to data entries, the United States is in the difficult position of trying to prove a negative—that is, that despite these data entry references, the defendant was not, in fact, encountered on those dates.   The defendant, meanwhile, can simply point to the date and speculate as to what it could mean, even in the absence of any evidence corroborating an actual

---

government bears the burden of proving that it began its prosecution within the statute of limitations period."   *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997); *see also Musacchio v. United States*, 136 S. Ct. 709, 718 (2016).   Despite this general approach, this Court has consistently held that, in Section 1326 cases, the burden rests with the defendant in proving a statute of limitations defense.   *See United States v. De Leon-Ramirez*, No. 3:17CR89 (HEH), 2017 WL 5163607, at *5 (E.D. Va. Oct. 11, 2017), *report and recommendation adopted*, No. 3:17CR89-HEH, 2017 WL 5162815 (E.D. Va. Nov. 7, 2017), *aff'd*, 925 F.3d 177 (4th Cir. 2019); *United States v. Ibarra-Reyes*, No. CRIM.A. 3:07CR345, 2007 WL 4287753, at *3 (E.D. Va. Dec. 5, 2007).   Regardless of who holds the burden, the evidence clearly demonstrates there was no statute of limitations violation here.

encounter.  That is not enough, nor should it be.  *Cf. Patterson v. New York*, 432 U.S. 197, 210

(1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt

all of the elements included in the definition of the offense of which the defendant is charged.

Proof of the non-existence of all affirmative defenses has never been constitutionally required.").

   B.  The Full Record Clearly Demonstrates the Defendant Was First "Found In" the United
       States on August 19, 2016, Following Her Arrest for Aggravated Sexual Battery.

   In the Supplemental Memorandum, the defendant presses her position that documents

referencing a May 29, 2001 data entry in the defendant's alien file constitute a statute of limitations

violation.[2]   While the defendant is correct that the Fourth Circuit has "yet to decide precisely when

the limitations period begins to run" in a Section 1326(a) prosecution, *United States v. De Leon-

Ramirez*, 2019 WL 2273510, at *4 (4th Cir. 2019), "the Fourth Circuit plainly views the

constructive knowledge theory with disfavor," *United States v. Vega-Pena*, 668 F. Supp. 2d 742,

745 (E.D. Va. 2009) (citing *United States v. Uribe-Rios*, 558 F.3d 347 (4th Cir. 2009)).   The

Fourth Circuit has explained "the plain text of section 1326 does not support a theory of

constructive knowledge.   An alien violates 8 U.S.C. § 1326 when the alien 'is at any time found

in[ ] the United States'—not when the alien is 'found or should have been found' in the country."

*United States v. Uribe-Rios*, 558 F.3d 347, 354 (4th Cir. 2009) (quoting 8 U.S.C. § 1326(a)).

"Because the 'found in' version of § 1326(a)(2) is a continuing offense, the date on which the

immigration agency 'should have discovered' the alien is simply irrelevant."   *Id.* (quoting *United

States v. Gordon*, 513 F.3d 659, 664–65 (7th Cir. 2008)).   The undersigned is not aware of any

case within the Fourth Circuit in which a defendant was held to be "found in" the United States on

---

[2] It does not appear that the defendant believes there is a statute of limitations violation based on
any other dates—particularly the data entries from 2004, 2007, and 2008.  The Supplemental
Memorandum mentions these entries in passing, but never claims they demonstrate a violation of
the statute of limitations.

the basis of constructive knowledge.  In any event, while the defendant implicitly argues that constructive knowledge may be enough to support the "found in" element, the defendant's argument seems to be that the United States, in fact, had actual knowledge of the defendant's presence in the United States in 2001.

The defendant's insistence that the May 29, 2001 data entry demonstrates that she was "found in" the United States in 2001 is plainly undermined by the record.   First, ICE Deportation Officer Kevin Ho has testified to the Court, "[a] full review of immigration databases, records, and [the defendant]'s Alien Registration file show that the only immigration encounters with [the defendant] occurred on or around December 5, 1999, August 19, 2016, and April 4, 2019."   [Gov't Ex. 1, at ¶ 10.]   The May 29, 2001 date that appears in the defendant's A-file are "a historical fingerprint enrollment entered into the system after the original date of the encounter."   [*Id.* at ¶ 7.]   Deportation Officer Ho's testimony is unrebutted.   Without evidence to support her interpretation, the defendant asks this Court to substitute defense speculation for Officer Ho's professional training and experience.   The Court should decline the invitation.

Second, the defendant's entire statute of limitations argument rests on the use of the words "encounter," "enforcement," and "WatchList" in documents referencing the May 29, 2001 data entry.   But a full review of the record demonstrates that "encounter," "enforcement," and "WatchList" are plainly innocuous entries.   The Court need look no further than the defendant's Exhibit F.   Exhibit F reflects "Historical Fingerprint Enrollment" on April 18, 2017 and November 20, 2017, and the defendant admits these entries reflect exactly that.   [Supp. Memo. at 4.]   Those data entries also contain the exact same notations—"Encounter," "Enforcement," and "WatchList"—that the defendant finds so significant in the context of the May 29, 2001 data entry. Accordingly, it is clear that the Court cannot read much into the use of these terms, as they are indisputably applied to "historical fingerprint enrollments."

Third, the reference in Exhibit E and Exhibit F to "DHS-US-VISIT-BSC" should assure the Court that Deportation Officer Ho is correct that the May 29, 2001 data entry reflects only a historical fingerprint enrollment.  As Deportation Officer Ho's unrebutted testimony states, the reference to "DHS-US-VISIT-BSC . . . shows that the fingerprint from the previously closed case was being uploaded as a potential alert or watchlist if the subject came back to the United States." [Gov't Ex. 1, at ¶ 7.]   If the Deportation Officer's testimony is not enough, the Court should consider the Government's Exhibit 9-1, which explains what US-VISIT BSC means.[3]   According to Government Exhibit 9-1, "US-VISIT provides biometric identification and analysis services to agencies."  [Gov't Ex. 9-1.]   Fingerprints are submitted to the DHS BSC or "Biometric Support Center" so that law enforcement can search the database in the future as suspects are identified. [*See id.*]

Finally, Government Exhibit 13-1, which was provided to the undersigned and immediately turned over to defense counsel on June 21, 2019, corroborates that on May 29, 2001, the defendant's fingerprints were uploaded to the US-VISIT system.[4]   On the first page of Government Exhibit 13-1, Encounter ID 15862811—the same encounter ID referenced in other

_____

[3] Later in the Supplemental Memorandum, defense counsel writes, "The defense has asked the government to produce documents explaining the database entries and the codes used, yet the government has not produced responsive documents to date."   [Supp. Memo. at 5.] Government's Exhibit 9-1 was, in fact, produced as responsive to this defense request on June 4, before the defendant's Supplemental Memorandum was filed.   On June 27, the undersigned provided defense counsel with an additional document responsive to this document request.

[4] The second page of Government Exhibit 13-1 includes December 4, 2004 and November 4, 2006 database entries for the defendant.   To the extent that defendant would argue these, too, represent subsequent encounters, the record makes clear these are references to the December 6, 1999 expedited removal.   These dates are listed as associated with an "Expedited Removal," and the only expedited removal for the defendant occurred after her December 6, 1999 entry.   The Encounter ID of 10497914 is the same Encounter ID associated across documents with the December 6, 1999 entry.   [*See* Gov't Ex. 13-1; Def. Ex. E.]   And the photograph associated with this "encounter" is one of the photographs associated with the defendant's 1999 entry.   [*See* Gov't Ex. 13-1; Def. Ex. E, F.]

documents referring to the May 29, 2001 date—demonstrates that the relevant entity for the entry is "DHS US-VISIT BSC," an entity charged with management of a biometric database.   [Gov't Ex. 13-1.]   In that document, May 29, 2001 is identified as the "date finger printed" and the "date loaded" for these fingerprints.   [*Id.*]   Deportation Officer Ho has explained that fingerprints for closed immigration cases would be uploaded to the US-VISIT system in this manner.   [Gov't Ex. 1, at ¶ 7.]

Accordingly, the full record clearly demonstrates that the May 29, 2001 data entry was just that—a date on which the defendant's fingerprints were uploaded to the US-VISIT system.   In addition to the above evidence, the Court should consider Deportation Officer Ho's conclusion: "If there had been an arrest or encounter by INS on or about May 29, 2001, there would be documents verifying that arrest or encounter, but none exist."   [Gov't Ex. 1, at ¶ 7.]   The defense has offered no theory for exactly what type of encounter they believe occurred or what immigration officials they believe encountered the defendant.   For all these reasons, the Court should reject the defendant's statute of limitations argument.

C.   Defense Counsel's Discovery Criticism Is Wholly Without Merit.

Without a persuasive argument on the merits, defense counsel turns to an allegation that the Government has "mishandl[ed] . . . its discovery obligations."   [Supp. Memo. at 6.]   This argument is entirely without merit.   At all times throughout this prosecution, the United States has been in complete compliance with the Agreed Discovery Order entered by this Court on April 26, 2019.   [Dkt. Entry 19.]   Not one of the discovery deadlines has even passed yet.   Accordingly, the discovery produced by the United States to date—far from being mishandled—has been ahead of schedule.

In fact, the United States has gone beyond its obligations to share discovery with the defense in a forthright and expeditious manner.   On April 16, 2019—two days before even

indicting the defendant in this matter—Government counsel produced the defendant's alien file, or "A-file," to defense counsel.   [Gov't Ex. 11.]   In so doing, Government counsel noted the Government's standard practice of redacting and omitting certain law enforcement sensitive material and personal identifying information for third parties.   [*See id.*]   Nonetheless, the Government explained, "In lieu of a protective order, we will make those materials available for your inspection at our office."   [*Id.*]   This is the approach the Government takes in all illegal reentry cases, and, as this Court is well aware, defense counsel frequently take the opportunity to examine the complete file.   Defense counsel in this case did not.

On May 17, the defense filed its motion to dismiss.   Upon realizing the nature of its argument, the undersigned identified certain documents within the A-file that had been previously withheld as law enforcement sensitive that might be relevant to this claim.[5]   While seeking authorization to release these documents in the Government's own filing, the undersigned also called defense counsel and left a voicemail with her on or about May 22, seeking to alert her to the existence of these documents and to invite her to come view them.   That call went unreturned. On May 28, the undersigned emailed defense counsel to alert her to the existence of potentially relevant documents, and to reiterate an invitation that defense counsel view the certified A-file in its entirety in person.   [Gov't Ex. 7.]   Defense counsel agreed to come to the United States Attorney's Office to view the file in its entirety on May 30.   Defense counsel did not show up for that meeting, and instead asked to reschedule to May 31, when she did, for the first time, accept the Government's invitation to review all discovery in the Government's possession.   [Gov't Ex.

---

[5]  The undersigned also reached out to defense counsel on multiple occasions to discuss what issues might be subject to a motion to dismiss, so that the parties could discuss them in advance.   Defense counsel was unwilling to engage on the matter.   Had defense counsel engaged with Government counsel throughout the process, these relevant documents could have been flagged even earlier.

8.]   Between May 29 and May 31, the undersigned also produced three documents that it believed might be relevant to defense counsel's argument.[6]   [Gov't Exs. 7, 8.]

On May 31, defense counsel made a discovery request for "all manuals, instructions, training materials or other documents explaining what the database is that this document came from, and what the codes and descriptions mean."[7]   [Gov't Ex. 9.]   On June 4, the undersigned produced to defense counsel one document that had been identified as responsive.   [*Id.*]   On June 4, the United States also took the unusual step of inviting defense counsel to meet with ICE Deportation Officer Ho, an experienced ICE professional, to discuss the documents relevant to the defense's statute of limitations argument, so that defense counsel could better understand the nature of the databases depicted and what the entries referred to.   [Gov't Ex. 10.]   Defense counsel met with Deportation Officer Ho at the United States Attorney's Office on June 6, 2019 for over an hour.   On June 11, the United States produced a redacted version of the defendant's certified A-file, again inviting defense counsel to view the entire file in person.   [Gov't Ex. 12.] On June 13, 2019, defense counsel visited the United States Attorney's Office and viewed the

---

[6] Defense counsel's characterization of these three documents produced over two emails as "dribbled out to the defense" is plain hyperbole.   [Supp. Memo. at 5.]   It took the United States time to collect additional discovery that might be relevant to a statute of limitations argument that defense counsel had not raised in advance of her filing.   The United States could not have anticipated that defense counsel would rely on database entries unrelated to actual encounters to support a statute of limitations argument and to have prepared additional discovery regarding that argument in advance.   In any event, that documents have "dribbled out" reflects only that the undersigned has turned over each document as soon as it has been identified.

[7] For the record, the United States does not concede that such information is discoverable.   While the defendant is entitled to discovery of evidence "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(i), that does not entitle her to a fishing expedition.   "For the defendant to show materiality under this rule, there must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."   *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (internal quotation marks and alterations omitted) (quoting *United States v. Ross*, 511 F.2d 757, 763 (5th Cir.1975)).   The defendant has not made such a showing here.

certified A-file for a second time.   On June 21, the undersigned received and immediately

provided to defense counsel an additional document reflecting the May 29, 2001 data entry date.

[Gov't Ex. 13.]

Because the United States has been, at all times, in full compliance with its obligations

under the Agreed Discovery Order—and has, in fact, exceeded its obligations—the Court should

reject defense counsel's argument that the Court "infer that the facts around the May 29, 2001

encounter support the defense proposition."   [Supp. Memo. at 6.]   Defendant's selective

quotation of the Fourth Circuit's ruling in *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th

Cir. 1995), does not counsel to the contrary.   First, *Vodusek* dealt with whether an inference could

be drawn *at trial*, after discovery obligations had passed.   *See id.* at 156.   In this case, the

discovery deadlines in the Agreed Discovery Order have not yet passed.   Second, *Vodusek*

demanded, "To draw an adverse inference from the absence, loss or destruction of evidence, it

would have to appear that the evidence would have been relevant to an issue at trial and otherwise

would naturally have been introduced into evidence."   *Id.*; *Fed. Ins. Co. v. Locash*, No.

2:12CV504, 2014 WL 12588635, at *6 (E.D. Va. Feb. 18, 2014) ("The spoliation rule applies

when a party 'that anticipates litigation' destroys 'what it knows, or reasonably should know, is

relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is

reasonably likely to be requested during discovery, and/or is the subject of a pending discovery

request.'" (quoting *E.I. duPont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 496

(E.D. Va. 2011))).   Here, there is no reasonable basis for the Government to have anticipated that

"manuals, instructions, [or] training materials" regarding ICE databases "would naturally have

been introduced into evidence" in this matter.   *Vodusek*, 71 F.3d at 156.   Finally, *Vodusek* permits

an adverse inference only "if it [is] found that [the party] caused destruction or loss of relevant

evidence."   *Id.*; *United States v. Wright*, 333 F. App'x 772, 778 (4th Cir. 2009) ("[W]ithout bad

faith there was simply no basis for an inference that the tape was adverse to the government.").

There is no such suggestion here.

    **II.**    **The Court Should Reject the Defendant's Due Process Argument, Because the Court Lacks Jurisdiction Under Section 1225(b)(1)(D) and the Defendant Has Not Shown Fundamental Unfairness in Her Prior Removal Proceedings.**

    A.  Section 1225(b)(1)(D) Bars Collateral Review of Expedited Removal Proceedings.

       Section 1225(b)(1)(D), in clear and unambiguous language, deprives federal courts of jurisdiction for collateral review of expedited removal hearings.[8]  This provision applies to a subset of arriving aliens, namely those aliens removed after a determination that they were inadmissible under Section 1182(a)(6)(C) (applying to an alien "who by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit" or "who falsely represents, or has represented, himself or herself to be a citizen of the United States") or 1182(a)(7) (applying to an alien applying for admission "who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document").  *See* 8 U.S.C. §§ 1225(b)(1)(D), 1182.  Aliens arriving under such circumstances,

---

[8] While the defendant was not entitled to administrative review under the circumstances of her case, it is worth noting that Congress has authorized administrative review of expedited removals. *See* 8 U.S.C. § 1225(b)(1)(C) ("[T]he Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 1157 of this title, or to have been granted asylum under section 1158 of this title.").  Similarly, arriving aliens subjected to expedited removal are entitled to judicial review of determinations made under Section 1225(b)(1) on certain issues, including "whether the petition is an alien," "whether the petitioner was ordered removed under such section," and "whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee[,] . . . or has been granted asylum."  8 U.S.C. § 1252(e)(2).

even if otherwise eligible for expedited removal, may apply for asylum.   *See* 8 U.S.C. § 1225(b)(1)(A)(i).

The jurisdictional bar set out in Section 1225(b)(1)(D) is in accordance with Supreme Court precedent, and there is no basis to set it aside.   As the defendant correctly explains, "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).   Section 225(b)(1)(D) sets out the procedure authorized by Congress relevant to this case: "In any action brought against an alien under . . . section 1326 of this title, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)."   8 U.S.C. § 1225(b)(1)(D).   Because the defendant is entitled to nothing more and nothing less than the procedure authorized by Congress, and because that procedure explicitly eliminates the availability of collateral review of a prior expedited removal order, the Court does not have jurisdiction to address the defendant's collateral review claims.

The defendant would have the Court believe that the Supreme Court's decision in *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) was sweeping and to the contrary.   Not so. *Mendoza-Lopez* was a ruling limited to its facts and circumstances, which are meaningfully distinguishable from the case here.   While the alien in *Mendoza-Lopez* was found within the United States before being deported, *id.* at 830, here, as the defendant herself has pointed out, the defendant was stopped at the border attempting to enter the United States.   This difference is critical, because, as the Supreme Court has noted, "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."   *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).   In particular, while "it is well-settled that 'aliens in deportation proceedings are to be accorded due process,'" *United States v. Lopez-Vasquez*, 227 F.3d 476, 484 (5th Cir. 2000)

(quoting *United States v. Lara–Aceves*, 183 F.3d 1007, 1010 (9th Cir.1999)), "an alien on the threshold of initial entry stands on a different footing," *id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953)); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990); *Zadvydas v. Davis*, 533 U.S. 678, 692–93 (2001); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 175 (1993); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972); *Knauff*, 338 U.S. at 544.   *Mendoza-Lopez* does not extend due process rights to aliens attempting to enter the United States, and this Court should not depart from precedent to expand its holding to do so.

Moreover, subsequent congressional activity confirms the narrow scope of *Mendoza-Lopez*.   Congress responded by *Mendoza-Lopez* by enacting Section 1326(d), which the defendant seeks to rely on here.   At the same time it enacted Section 1326(d), Congress also enacted Section 1225(b)(1)(D), which expressly carved out expedited removal cases—with exceptions not applicable here—from Section 1326(d) review.   Where two statutes are capable of coexistence, absent a clearly expressed congressional intention to the contrary, courts should interpret the statutes in a manner that will preserve each.   *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984).   In this case, the defendant's status at the time of removal—an alien in the United States or an alien attempting entry—provides a meaningful and intentional distinction that this Court can embrace to preserve both provisions.

B. <u>The Court Should Decline To Resolve the Jurisdictional Issue, Because Any Error Is Harmless.</u>

This Court need not—and should not—resolve the constitutionality of Section 1225(b)(1)(D), because any alleged due process error is clearly harmless.   "[T]he principle of constitutional avoidance requires the federal courts to strive to avoid rendering constitutional rulings unless absolutely necessary."   *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015)

(alteration omitted) (quoting *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156–57 (4th Cir. 2010)); *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."). "This is a fundamental rule of judicial restraint." *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (internal quotation marks omitted) (quoting *Three Affiliated Tribes of Berthold Reservation v. World Engineering*, 467 U.S. 138 (1984)). This Court should, therefore, avoid deciding a constitutional question "if any error was harmless." *Reed*, 780 F.3d at 269.

Experience shows that a harmless error inquiry is workable under these circumstances. For almost twenty years the Fifth Circuit has wisely avoided the question of the constitutionality of Section 1225(b)(1)(D) by applying a harmless error test. *See, e.g.*, *United States v. Lopez-Vasquez*, 227 F.3d 476, 486 (5th Cir. 2000) ("[S]ection 1225(b)(1)(D) does not preclude the district court or this court from determining that the requisites of a *Mendoza-Lopez* claim as asserted by Lopez-Vasquez are *not* met"). This Court should follow the path of the Fifth Circuit to avoid the constitutional issue in this case.

While the canon of constitutional avoidance would be compelling under any circumstances, the case for avoidance here is particularly strong because the Court would avoid a ruling on a constitutional issue that is currently squarely before the Fourth Circuit in *United States v. Silva*, 313 F. Supp. 3d 660 (E.D. Va. 2018). In *United States v. Silva*, No. 18-4652, the Fourth Circuit will answer the following question: "Is § 1225(b)(1)(D) unconstitutional in precluding review in a § 1326 prosecution of a prior removal order for an arriving alien who has . . . neither applied for asylum nor claimed persecution abroad?" Brief of the United States, *United States v. Silva*, No. 18-4652, at 7 (Jan. 28, 2019). Because the Fourth Circuit will resolve this

14

constitutional question imminently, this Court can—and should—decline to address it here, because the any error that occurred is readily recognizable as harmless.

    C. <u>The Defendant's Collateral Attack Fails Because She Has Not Shown Fundamental Unfairness in Her Prior Removal Proceedings.</u>

        *i.*     *The Defendant Has Not Met Her Burden of Proving Due Process Violations.*

The parties' positions on whether any violations of regulations occurred in the expedited removal proceedings for the defendant has already been briefed, and the Supplemental Memorandum offers nothing new. The United States stands on its position as articulated in the response filed by the United States on May 31, 2019.

        *ii.*     *The Defendant Has Not Carried Her Burden of Demonstrating Prejudice Resulting from the Alleged Due Process Violations.*

The United States has explained that for two independent reasons, the defendant cannot meet her burden to show that "but for the errors complained of, there was a reasonable probability that [s]he would not have been deported" and that the "actual prejudice [the defendant suffered] *resulted from* the due process violation at issue." *United States v. Lopez-Collazo*, 824 F.3d 453, 462, 466 (4th Cir. 2016) (internal quotation marks omitted) (quoting *United States v. El Shami*, 434 F.3d 659, 665 (4th Cir. 2005)). First, and critically, remedying these violations does not mean the defendant would have been advised of the opportunity to withdraw her application for admission. The law is clear: an alien in expedited removal proceedings is never entitled to be advised of the opportunity to request withdrawal of her application for admission. *See, e.g.*, *United States v. Meraz-Olivera*, 472 F. App'x 610, 612 (9th Cir. 2012). Signing the back of the Form I-860 has nothing to do with the opportunity to seek withdrawal. The Form I-860 and Form I-296—even if perfectly translated—would not inform the defendant of the opportunity to seek withdrawal. Accordingly, the purported due process violations the defendant claims in this case are completely untethered from the prejudice she claims to have suffered. The defendant's

Supplemental Memorandum never responds to this argument.   Accordingly, because the defendant cannot demonstrate any causal link between the purported violations and her failure to seek to withdraw her application, there was no prejudice, and the defendant's collateral attack should be rejected.

Second, in the unlikely event the defendant had sought to withdraw her application for admission to the United States, she has not demonstrated a reasonable probability that her application would have been granted.   The defendant's claim that her case was "free of aggravating factors" is flatly wrong.   [Supp. Memo. at 18.]   The record reflects—and the defendant does not contest in her affidavit—that she attempted to enter the United States using a fraudulent passport.   [*See* Gov't Ex. 2.]   That the defendant attempted to the enter the United States using fraudulent documents is a critical factor for the Court to consider in evaluating whether the defendant would likely have been granted withdrawal.   *See, e.g.*, *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1091 (9th Cir. 2011) (relying on the "disqualifying effect" of obvious fraud in assessing the availability of withdrawal).   The Supplemental Memorandum claims, without citing any authority, that the defendant's use of fraudulent identification in her entry attempt "is not necessarily exacerbating."   [Supp. Memo. at 16.]   But of course it is.   The INS Field Manual expressly says so: "An expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant."   INS Inspector's Field Manual § 17.2(a) (2007).   The decision to grant withdrawal of an application rests in the discretion of the Attorney General.   *See, e.g.*, *United States v. Silva*, 313 F. Supp. 3d 660, 668 (E.D. Va. 2018).   The defendant provides no persuasive basis to believe she would have received this discretionary relief.

The Supplemental Memorandum also attempts to confuse the record regarding the prominence of withdrawal in expedited removal cases.   In the defendant's Motion, she notes that

in 2008, "44 percent of aliens in expedited removal proceedings were permitted to withdraw their applications for admission." [Memo. at 14.] In the Supplemental Memorandum, the defendant claims to have new data. The evidence now shows, the defendant says, "In 1999, 498,729 aliens were permitted to withdraw their application for admission, nearly three times the number who were formally removed, 180,101." [Supp. Memo. at 17.] The defendant is able to cite the more favorable statistics by conflating expedited removal proceedings with other formal removal proceedings. But the defendant was right the first time to focus on expedited removal proceedings—the type of proceeding the defendant was subjected to—for relevant statistics. The defendant's more recent statistics come from the 1999 Statistical Yearbook of the Immigration and Naturalization Service, but only one page later the more accurate figures are revealed:

> Inspectors determined that about 600,000 arriving aliens in fiscal year 1999 were inadmissible. Of these about 173,000 were inadmissible for reasons that made them subject to expedited removal. However, 79,000 of those aliens were allowed to withdraw their application for admission. The remaining 94,000 were placed in expedited removal.

Dep't of Justice, Immigration & Naturalization Serv., 1999 Statistical Yearbook of the Immigration and Naturalization Service, at 203. In other words, in less than forty-six percent of cases, withdrawal was permitted. Even without controlling for the question of obvious fraud— an important aggravating factor in the defendant's case—withdrawal was available in less than half of all expedited removal cases.

In 1999, less than half of all aliens subject to expedited removal were allowed to withdraw their application for admission. Aliens engaged in obvious fraud—like the defendant—were even less likely to be permitted to withdraw their applications. Given these factors, it is unlikely the defendant would have been permitted to withdraw her application, in the unlikely event she sought to, and thus the defendant has failed to carry her burden of demonstrating actual prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as the reasons stated in the response filed by the United States on May 31, 2019, the United States respectfully requests that the Court deny the defendant's motion to dismiss the indictment.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


By: _____/s/_____
        Anthony W. Mariano
        Special Assistant United States Attorney
        Danya E. Atiyeh
        Assistant United States Attorney
        United States Attorney's Office
        Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3700
        Fax:    (703) 299-3868
        Anthony.Mariano2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2019, I caused a copy of the foregoing memorandum to be

filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice

of Electronic Filing (NEF) to all counsel of record.

_____/s/_____
Anthony W. Mariano
Special Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax:    (703) 299-3868
Anthony.Mariano2@usdoj.gov