IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:19-cr-127 (LMB) |
| LOURDES TERRAZAS SILES, a/k/a Lourdes | ) | |
| Terrazas-Silas, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court is a motion to dismiss the one-count indictment charging Lourdes

Terrazas Siles ("Terrazas Siles" or "defendant")[1] with unlawful reentry after removal in violation

of 8 U.S.C. § 1326(a). The parties have fully briefed the motion, and the Court has heard oral

argument. For the reasons stated in open court and as elaborated below, defendant's motion will

be denied.

I.

Terrazas Siles is a native of Bolivia. In late 1999, when she was 20 years old, she set out

to enter the United States by paying a "coyote"[2] to help her obtain a false passport and get into

the United States. On December 5, 1999, she followed the coyote across a pedestrian bridge

toward the pedestrian entrance of the U.S. border in San Ysidro, a district in San Diego,

California. The coyote passed through the pedestrian turnstile and disappeared. Before Terrazas

Siles could do the same, she was intercepted by an immigration officer. The officer determined

---

[1] Although most of the documents in defendant's immigration file list her name as "Lourdes
Terrazas-Silas," the case caption has been amended to reflect the correct spelling of her name.

[2] "In the current lexicon of immigration, a 'coyote' is a person who expedites unlawful entry into
the United States from Mexico, i.e., a specialized trafficker in human beings." Arias v. U.S.
Dep't of State, No. 8:10-cv-721-T-23TBM, 2010 WL 3835799, at *1 (M.D. Fla. Sept. 29, 2010).

that the passport defendant had attempted to present was fake and directed her to "secondary inspection" for "further investigation." Def.'s Mot. Ex. B [Dkt. No. 22-1].

Under the applicable provisions of the Immigration and Nationality Act ("INA"), an alien who arrives at the U.S. border is deemed to be an applicant for admission to the United States. See 8 U.S.C. § 1225(a)(1). Defendant's application was processed by immigration officer R. Sorges II ("Sorges"), who conducted the proceedings in Spanish and recorded defendant's responses on an I-867A form. See Gov't's Opp'n Ex. 2 [Dkt. No. 23-1]. Before defendant was asked any questions, she was advised that Sorges was an officer of the U.S. Immigration and Naturalization Service; that she "d[id] not appear to be admissible or have the required legal papers authorizing . . . admission to the United States"; that, as a result, she could be "denied admission and immediately returned to [her] home country without a hearing"; that if she were removed, she would be "barred from reentry for a period of 5 years or longer"; and that providing false testimony would subject her to civil or criminal penalties or further immigration consequences. Id. at 1. Defendant was further advised that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country" and that if she had any such concerns, she should communicate them to Sorges, who would arrange for a confidential interview with an asylum officer. Id. Defendant told Sorges that she understood those advisements and was willing to answer questions. Id. at 1-2. She explained that she had paid the coyote $1500 for the false passport and for help getting her into the United States. Id. at 2. She claimed that she had intended to visit her uncle in Virginia for 10 days and then return to Bolivia, upon which time she would pay the coyote an additional $4500. Id. at 2-3. Defendant admitted knowing it was "illegal to present a document not lawfully issued to [her]" at the border. Id. at 2. She explained that she had no fear of returning to Bolivia and, when asked if

she had anything further to add, stated that she "just want[ed] to find the man who left"—presumably the coyote who had abandoned her. Id. at 3. Sorges certified that the I-867A form was read to defendant in Spanish, and defendant initialed each page to reflect that she had reviewed its contents.

Based on defendant's conduct and statements, immigration authorities determined that she was inadmissible under "sections 212(a)(6)(c)(i) and 212(a)(7)(A)(i)(1) of the INA." Def.'s Mot. Ex. B [Dkt. No. 22-1]; see 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."); id. § 1182(a)(7)(A) ("[A]ny immigrant at the time of application for admission . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter . . . is inadmissible."). The authorities ordered defendant removed from the United States under the INA's expedited removal provisions because she had presented false documentation, did not have any valid entry documents, and had not expressed any desire to apply for asylum or that she feared persecution upon return to Bolivia. See 8 U.S.C. § 1225(b)(1)(A)(i) ("If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."). Defendant was held in immigration custody for approximately six weeks before being deported on January 27, 2000.

At some unknown time after being removed, Terrazas Siles returned to the United States, slipped across the border undetected, and found her way to Virginia. There is no evidence in the

3

record that she had any contact with immigration authorities for nearly 16 years. But she was unable to avoid encounters with local law enforcement. She was arrested and charged with domestic violence in Arlington, Virginia in 2001 (a charge that was ultimately nolle prossed); with shoplifting in Alexandria, Virginia in 2003; and with failure to appear in Prince William County, Virginia in 2004. In August 2016, defendant was arrested and charged with felony aggravated sexual battery by a parent, stepparent, grandparent, or stepgrandparent of a victim at least 13 years old but less than 18 years old. Authorities at the Prince William County Adult Detention Center, where defendant was held on the charge, contacted U.S. Immigration and Customs Enforcement ("ICE") officials about her immigration status. In June 2017, defendant was convicted in state court and sentenced to 20 years' incarceration with all but three years suspended. After she was released from state custody in early April 2019, she was arrested by ICE officials and turned over to the U.S. Marshals Service. On April 18, 2019, a federal grand jury in the Eastern District of Virginia returned a single-count indictment charging defendant with unlawful reentry after removal in violation of 8 U.S.C. § 1326, which makes it a felony punishable by up to two years' imprisonment for any noncitizen[3] who was previously denied admission to or removed from the United States to "enter[], attempt[] to enter, or [be] at any time found in . . . the United States" without prior consent of the Attorney General or his designee. 8 U.S.C. § 1326(a).

Defendant has moved to dismiss the indictment on three grounds: that this prosecution is barred by the statute of limitations; that her expedited removal was fundamentally unfair and

---

[3] "[T]he term 'noncitizen' is used 'to refer to any person who is not a citizen or natural of the United States.'" United States v. Rivera Lopez, 355 F. Supp. 3d 428, 434 n.8 (E.D. Va. 2018) (quoting Pereira v. Sessions, 138 S. Ct. 2105, 2110 n.1 (2018)).

4

cannot serve as the basis for the unlawful reentry charge; and that she never "entered" the United States during her 1999 encounter with immigration authorities and therefore cannot be said to have "reentered" the United States at a later date. None of these arguments is persuasive.

## II.

The parties agree that the applicable statute of limitations for a § 1326 prosecution is five years. United States v. Uribe-Rios, 558 F.3d 347, 351 & n.5 (4th Cir. 2009) (citing 18 U.S.C. § 3282(a)). They likewise agree that the statute begins to run when the defendant is "found in . . . the United States." 8 U.S.C. § 1326(a)(2). But they disagree over which party bears the burden of proof as to the statute of limitations, what standard of governmental awareness of a defendant's location inside the United States triggers the limitations period, and how those legal principles apply to this case. Even assuming that the government bears the burden of proof[4] and that constructive knowledge is enough to trigger the limitations period,[5] the record clearly demonstrates that this prosecution is timely.

---

[4] In its initial brief in opposition, the government stated that it, and not defendant, "bears the burden of proving that it began its prosecution within the statute of limitations period." Gov't's Opp'n 3 (quoting United States v. Wilson, 118 F.3d 228, 236 (4th Cir. 1997)). In supplemental briefing, the government reversed course, asserting (in a footnote) that "[d]espite this general approach, this Court has consistently held that, in Section 1326 cases, the burden rests with the defendant in proving a statute of limitations defense." Gov't's Suppl. Resp. 3 n.1. The government is correct that judges of this district have in the past treated the statute of limitations as an affirmative defense the defendant must prove, see, e.g., United States v. De Leon-Ramirez, No. 3:17-cr-89, 2017 WL 5163607, at *5 (E.D. Va. Oct. 11, 2017), report and recommendation adopted, No. 3:17-cr-89, 2017 WL 5162815 (E.D. Va. Nov. 7, 2017), aff'd, 925 F.3d 177 (4th Cir. 2019), as have other federal courts, see, e.g., United States v. Zamudio, 787 F.3d 961, 968 (9th Cir. 2015) (holding that the defendant had "failed to meet his burden of proving his statute of limitations defense"); see also United States v. Soriano-Hernandez, 310 F.3d 1099, 1103 (8th Cir. 2002) (collecting cases). Ultimately, the Court finds it unnecessary to resolve this issue because the record clearly establishes that the prosecution is timely.

[5] Although the Fourth Circuit "plainly views the constructive knowledge theory with disfavor," United States v. Vega-Pena, 668 F. Supp. 2d 742, 745 (E.D. Va. 2009), it has "yet to decide precisely when the limitations period begins to run on th[e § 1326] offense," United States v. De

The government argues that Terrazas Siles was first "found in" the United States following her expedited removal when she was arrested and charged with aggravated sexual battery in August 2016. Defendant disagrees, arguing that the government was aware of her presence much earlier. A few of the dates she proposes can be rejected at the outset. First, she mentions, "[a]s an aside," that she had "interaction[s] with local law enforcement" in Virginia in 2001, 2003, and 2004. Def.'s Mot. 4 n.2. As the government correctly points out, the Fourth Circuit has rejected the notion that a run-in with local law enforcement, without more, puts the federal government on notice about a noncitizen's presence in the country. See Uribe-Rios, 558 F.3d at 356 ("[F]undamental principles of dual sovereignty do not allow us to impute the knowledge of state officials to federal officials.").

Defendant also observes that her electronic immigration file features "activity" in November 2004, July and September 2007, and February and May 2008, suggesting that the government may have been aware of her presence in the country as of those dates. The government responds that all of those entries merely reflect clerical "updates to immigration databases" rather than genuine encounters with federal officials. See Gov't's Opp'n 3. Defendant appears to accept this explanation, see Def.'s Suppl. 4 ("taking as true the

---

Leon-Ramirez, 925 F.3d 177, 182 (4th Cir. 2019) (citing Uribe-Rios, 558 F.3d at 352-56, which reserved the question whether constructive knowledge of the defendant's presence in the United States could trigger the statute of limitations). The Fourth Circuit is not alone in deferring a ruling on this issue. See, e.g., Zamudio, 787 F.3d at 966 ("[W]e have not addressed whether such discovery and identification must be based on the government's actual knowledge or can instead be proven under a constructive knowledge theory."). But see United States v. Gordon, 513 F.3d 659, 665 (7th Cir. 2008) (holding that only actual knowledge, not constructive knowledge, triggers the limitations period). This issue does not have to be resolved because defendant proceeds on an actual knowledge theory and because the record does not support a finding of constructive knowledge in any event.

government's contentions that the references to 2004, 2007, and 2008 reflect data migration or computer updates"), and the Court finds no reason to doubt it.

That leaves May 29, 2001, a date listed in defendant's immigration file as an "[e]ncounter" related to immigration "[e]nforcement." See, e.g., Def.'s Suppl. Ex. F [Dkt. No. 28-1]. Although Terrazas Siles does not claim that she actually interacted with federal immigration or law enforcement officials on or around that date, she posits that officials must have somehow become aware of her presence in the country. See, e.g., Def.'s Mot. 3-4 ("In May 2001, for reasons unknown to the defense, immigration database records show a law enforcement inquiry regarding [defendant] . . . , indicating an awareness of her presence in the United States at the time."); Def.'s Suppl. 3 ("Records produced [by the government] show that [defendant] was 'encounter[ed]' for enforcement purposes on May 29, 2001[, meaning that] immigration officials had actual knowledge of [her] presence in the United States by [that date]." (third alteration in original) (quoting Def.'s Mot. Ex. E [Dkt. No. 22-1])). That claim does not withstand scrutiny. As part of its brief in opposition, the government submitted a declaration of ICE officer Kevin Ho ("Ho") explaining that the May 29, 2001 database record "appears to be a historical fingerprint enrollment entered into the system after the original date of [defendant's] encounter or apprehension for watchlist purposes only." Gov't's Opp'n Ex. 1 [Dkt. No. 23-1] ¶ 7; see id. ("The 'Activity Organization' section indicates 'DHS-US-VISIT-BSC.' This shows that the fingerprint from the previously closed case was being uploaded as a potential alert or watchlist if [defendant] came back to the United States."); see also Gov't's Suppl. Resp. 6-7 (explaining further the US-VISIT system and why the May 29, 2001 entry was simply the "date on which the defendant's fingerprints were uploaded to the US-VISIT system"); Addendum to Suppl. Resp. 1-2 (providing additional documentation). The government's explanation is

convincing and, once credited, undercuts defendant's argument that federal authorities must have known she had returned to the United States as of May 2001.

Defendant's attempts to sow doubt about the May 2001 data entries are unavailing. First, she highlights that the May 2001 event is described as an "[e]ncounter" related to "[e]nforcement" and the "WatchList." See Def.'s Suppl. 3-4 (quoting id. Ex. F [Dkt. No. 28-1]). But the government has explained to the Court's satisfaction that those terms are simply computer codes related to data entry and do not support a finding of actual or constructive knowledge about defendant's presence in the United States. Second, she attempts to undercut Ho's declaration by pointing to April 2017 and November 2017 entries that "are expressly described as 'historical fingerprint enrollment.'" Id. at 4 (quoting id. Ex. F [Dkt. No. 28-1]). Defendant argues that the government's electronic database "clearly had the capacity to designate an entry [as] 'historical fingerprint enrollment' if and when it was appropriate" and urges the Court to conclude that the May 2001 entry cannot have been such an enrollment. Id. Here, defendant ignores the fact that the May 2001 and 2017 entries were performed in completely different computer systems, see Gov't's Opp'n Ex. 1 [Dkt. No. 23-1] ¶¶ 5-6 (describing the transition from the Deportable Alien Control System to the Enforce Alien Removal Module system from 2007 to 2010), which likely had different data entry inputs. Moreover, although defendant relies on computer entries with minimal information, none of those entries provides any of the sort of information—including addresses, specific facts, assessments of immigration status or criminal consequences, and the like—that surely would have accompanied a genuine immigration arrest or encounter. See id. ¶¶ 7-8 ("[I]f there had been an arrest or encounter by immigration officials on or about any of these dates, there would be documents verifying that arrest or encounter . . . ."). At bottom, defendant asks the Court to

disbelieve the government's reasonable, consistent explanations and to speculate wildly about what the May 2001 data entries could represent. Such untethered speculation is an inappropriate basis upon which to dismiss an indictment.[6]

Accordingly, defendant's argument that the federal government knew of her presence in the United States as of May 2001 is without merit. Because defendant was first "found in" the United States for purposes of § 1326(a) when local law enforcement officials informed ICE officials about her August 2016 arrest for aggravated sexual battery, this prosecution is timely.

III.

Defendant's second argument is styled as a collateral attack on her underlying removal proceeding pursuant to 8 U.S.C. § 1326(d), which requires her to demonstrate that (i) she "exhausted any administrative remedies that may have been available to seek relief against the order"; (ii) the removal proceedings "improperly deprived [her] of the opportunity for judicial review"; and (iii) the "entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). If defendant makes all three showings, her "illegal reentry charge must be dismissed as a matter of law." United States v. El Shami, 434 F.3d 659, 663 (4th Cir. 2005).

Defendant argues that her expedited removal proceeding was fundamentally unfair because two documents were not translated into Spanish for her and because there is no evidence that she was served with and signed an important form. She argues that these deficiencies not

---

[6] Defendant also claims that the government has engaged in a "troubling" series of discovery abuses, releasing documents to the defense "just before the original motions hearing date" and without adequate explanation. Def.'s Suppl. 5. She urges the Court to draw an adverse inference against the government based on those alleged abuses. See id. at 6 (citing Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)). The Court has reviewed the government's responses to those accusations, see Gov't's Suppl. 7-11, and is satisfied that the government engaged in a good-faith effort to satisfy its discovery obligations and that no adverse inference is appropriate.

only violated applicable regulations but also deprived her of any ability "to appreciate the full consequences of [the proceedings] and to make informed decisions that might have affected those consequences." Def.'s Mot. 11. Specifically, she argues that had she been better informed, she would have pursued withdrawal of her application for admission—a discretionary remedy that could have saved her from immigration and criminal consequences. In response, the government argues that defendant is statutorily barred from bringing a § 1326(d) collateral attack against her expedited removal. It further argues that even assuming she could bring such a challenge, she could not show the due process violation or prejudice necessary to prevail. As explained below, the government has the better argument.

A.

Normally, a noncitizen who is removed, later returns to the United States, and faces prosecution for unlawful reentry can challenge her underlying removal under § 1326(d). But Congress has attempted to withhold that remedy from noncitizens, like Terrazas Siles, who were subject to expedited removal. The INA deems any noncitizen "present in the United States who has not been admitted or who arrives in the United States" to be "an applicant for admission." 8 U.S.C. § 1225(a)(1). Every such noncitizen applicant is subject to inspection by immigration authorities, id. § 1225(a)(3), and, if the authorities find that the applicant is inadmissible, they must "order the [noncitizen] removed from the United States without further hearing or review" unless the noncitizen intends to apply for asylum, id. § 1225(b)(1)(A)(i).[7] Expedited removal

---

[7] A noncitizen who indicates a fear of persecution or an intent to apply for asylum must be referred for an interview by an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). If the officer finds the noncitizen does not have a "credible" fear of persecution, "the officer shall order the [noncitizen] removed from the United States without further hearing or review." Id. § 1225(b)(1)(B)(iii)(I).

orders are generally not subject to administrative review. See id. § 1225(b)(1)(C). Further, the INA provides that "[i]n any action brought against [a noncitizen] under . . . section 1326 of this title, the court shall not have jurisdiction to hear any claim attacking the validity of an order of [expedited] removal." Id. § 1225(b)(1)(D). In other words, Congress has purported to withhold from noncitizens subject to expedited removal the right to bring a collateral challenge against their removal under § 1326(d).

The parties agree that defendant was subject to expedited removal under the INA and falls within the terms of § 1225(b)(1)(D), which, in the government's view, means that the Court lacks jurisdiction to adjudicate defendant's collateral attack. Defendant disagrees, arguing that § 1125(b)(1)(D) is unconstitutional under the Supreme Court's decision in United States v. Mendoza-Lopez, 481 U.S. 828 (1987), because it deprives her of any meaningful opportunity to contest one of the elements of the offense with which she has been charged. Another judge of this district has recently endorsed that argument in a lengthy published opinion. See United States v. Silva, 313 F. Supp. 3d 660, 669 (E.D. Va. 2018) (holding that § 1225(b)(1)(D) "is unconstitutional to the extent it prohibits 'some meaningful review' in a prosecution under [§ 1326] of an alien's claim that the underlying deportation proceeding was 'fundamentally unfair.'" (emphasis omitted) (quoting Mendoza-Lopez, 481 U.S. at 838-39)), appeal docketed, No. 18-4652 (4th Cir. Sept. 11, 2018). Other federal courts have agreed, see, e.g., United States v. Barajas-Alvarado, 655 F.3d 1077, 1085 (9th Cir. 2011) ("Given the language and reasoning in Mendoza-Lopez, we conclude that its holding applies equally to alien criminal defendants seeking to challenge expedited removal orders used as predicates in § 1326 prosecutions."), and no court squarely confronting the issue has held that § 1225(b)(1)(D) is constitutional. Defendant asks this Court to join that nascent consensus and hold that

11

§ 1225(b)(1)(D) does not bar her from claiming that her expedited removal proceeding was fundamentally unfair and so cannot serve as the basis for this unlawful reentry prosecution.

Invoking the avoidance canon, the government urges the Court to ignore this constitutional question and instead deem any constitutional issue harmless in light of deficiencies in defendant's § 1326(d) challenge. Although the doctrine of constitutional avoidance is a "fundamental rule of judicial restraint," Jean v. Nelson, 472 U.S. 846, 854 (1985) (citation omitted), and may at times be appropriate where an alleged constitutional violation would be harmless error, see, e.g., United States v. Reed, 780 F.3d 260, 269 (4th Cir. 2015) (declining to address a Confrontation Clause question after finding that any error would be harmless), it is not appropriate in every case and does not excuse federal courts of their "duty . . . to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Here, avoiding defendant's constitutional argument is inappropriate for two reasons. First, defendant presents a square conflict between § 1225(b)(1)(D) and Mendoza-Lopez. The government agrees that defendant falls within § 1225(b)(1)(D) and has not offered any other plausible construction that would permit the Court to avoid the issue. Second, the government ignores the significance of Congress's choice to frame § 1225(b)(1)(D) as a jurisdiction-stripping statute. Because that section purports to deprive federal courts of jurisdiction to hear a certain class of claims, it implicates the judiciary's unceasing and "independent obligation to determine whether subject-matter jurisdiction exists" before reaching the merits. See United States v. Thompson, 924 F.3d 122, 129 (4th Cir. 2019) (quoting Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006)). Indeed, were this Court to accept the government's invitation to adjudicate defendant's § 1326(d) challenge without explicitly addressing the constitutional question, the result might ultimately be "best read as [an] implicit[] holding that § 1225(b)(1)(D) is unconstitutional to the extent the

12

statute forbids even this limited review." Barajas-Alvarado, 655 F.3d at 1086 n.9. For these reasons, the Court concludes that it must address defendant's constitutional argument.[8]

This Court agrees with the holdings in Silva and Barajas-Alvarado that § 1225(b)(1)(D) is in irreconcilable conflict with Mendoza-Lopez and the constitutional rule that case sets forth. In Mendoza-Lopez, the Supreme Court addressed "whether an alien who is prosecuted under 8 U.S.C. § 1326 for illegal reentry following deportation may assert in that criminal proceeding the invalidity of the underlying deportation order." 481 U.S. at 830. The Court first held that Congress had neither expressly nor impliedly authorized a collateral attack against an underlying removal order in any INA provision. See id. at 834-37. But "[t]hat Congress did not intend the validity of the deportation order to be contestable in a § 1326 prosecution d[id] not end [the Court's] inquiry." Id. at 837. Instead, the Court proceeded to hold that any statute which "envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, . . . does not comport with the constitutional requirement of due process." Id. (emphasis omitted). The Court concluded that "where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be

---

[8] The government offers two additional arguments why this Court should avoid ruling on the constitutional issue. Neither is persuasive. First, in its initial opposition to defendant's motion to dismiss the indictment, the government argued that the defendant "ha[d] not raised [the] constitutional challenge to Section 1225(b)(1)(D), and a court should not invalidate an act of Congress without full briefing." Gov't's Opp'n 5 n.2. In response, the Court permitted the parties to submit additional briefing on the issue, thereby resolving this objection. Second, the government underscores that Silva is on appeal to the Fourth Circuit and was argued on May 9, 2019, suggesting that the Court ought not rule on the constitutional issue while it is before the Fourth Circuit. That an issue is pending before a court of appeals might on occasion be a reason to stay proceedings altogether—something neither party has sought here—but does not give the Court the discretion to pick and choose which threshold questions it must resolve.

made available before the administrative order may be used to establish conclusively an element of a criminal offense"—particularly where the underlying removal order is "used to convert the misdemeanor of unlawful entry into the felony of unlawful entry after a deportation." Id. at 838.[9]

The reasoning of Mendoza-Lopez applies with equal force to those who, like Terrazas Siles, face prosecution for unlawful reentry after having been subject to an expedited removal order. The only fact separating defendant's felony charge for violating § 1326 from a misdemeanor charge for violating § 1325 is her expedited removal order. "[W]here a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." Mendoza-Lopez, 481 U.S. at 837-38 (emphasis in original). Because § 1225(b)(1)(D) denies her any form of meaningful judicial review of that order, it is unconstitutional.

None of the government's arguments to the contrary is convincing. The government first argues that defendant may not seek to avail herself of any right or remedy not already reflected in the INA's expedited removal proceedings. In the government's submission, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Gov't's Suppl. Resp. 12 (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)). That was certainly not the case in Mendoza-Lopez, where the Court

---

[9] Congress provided such an "alternative means of obtaining judicial review" when it enacted § 1326(d). As this Court has previously observed, "whether there may be circumstances in which due process requires that a defendant be given an opportunity to bring a collateral attack beyond the requirements and limitations of § 1326(d) remains an open question." Rivera Lopez, 355 F. Supp. 3d at 435 (emphasis in original).

concluded that Congress had not intended to authorize any form of collateral challenge but nonetheless proceeded to hold that such a challenge was constitutionally required. It is easy to pinpoint where the government's argument goes awry: It obscures a fundamental difference between the due process to which a noncitizen is due in immigration proceedings on the one hand and the due process to which a criminal defendant is due on the other. See Silva, 313 F. Supp. 3d at 676 ("[T]he relevant due process analysis is the due process accorded a criminal defendant, not the due process to which the alien was entitled at the time of the deportation proceedings." (emphasis in original)). Defendant has not attempted to bring an administrative challenge or habeas corpus petition demanding additional due process rights vis-à-vis her immigration proceedings. Rather, she is being criminally prosecuted for committing a felony offense based on an expedited removal order, and it is that criminal prosecution which triggers the Mendoza-Lopez due process right.

The government next tries to distinguish Mendoza-Lopez, pointing out that Mendoza-Lopez was found within the United States before he was ordered removed, whereas Terrazas Siles was stopped at the border. To be sure, a noncitizen "on the threshold of initial entry stands on a different footing" than one who has been in the country for a meaningful period of time, United States v. Lopez-Vasquez, 227 F.3d 476, 484 (5th Cir. 2000) (citation omitted), "for the power to admit or exclude aliens is a sovereign prerogative," Landon v. Plasencia, 459 U.S. 21, 32 (1982). But once again, the government compares apples to oranges. As the court in Silva explained, "[t]he due process to which the alien was entitled at the time of the deportation proceedings is relevant in determining whether the collateral attack succeeds; it does not determine whether the collateral attack may occur." 313 F. Supp. 3d at 676 (emphasis in original). Although it may be the rare case in which someone subject to expedited removal can

15

carry her burden in a § 1326(d) collateral attack, the Constitution guarantees each defendant the right to try.

B.

To prevail under § 1326(d), Terrazas Siles must show that (i) she exhausted available administrative remedies, (ii) she was deprived of an opportunity for judicial review, and (iii) the entry of her underlying removal order was fundamentally unfair. The first two requirements are easily met here. The INA's expedited removal provisions expressly deny noncitizens administrative and judicial review, with a few exceptions not relevant here. Courts considering § 1326(d) challenges of expedited removal orders have held that no more is needed to satisfy the first and second requirements, see, e.g., United States v. Raya-Vaca, 771 F.3d 1195, 1202 (9th Cir. 2014), and the government advances no argument to the contrary.

What remains is the fundamental unfairness prong, which requires Terrazas Siles to show both that her "due process rights were violated by defects in h[er] underlying deportation proceeding" and that she "suffered prejudice as a result of the defects." El Shami, 434 F.3d at 664; see id. at 665 (the noncitizen defendant must show that "but for the errors complained of, there was a reasonable probability that he would not have been deported"); see also United States v. Daley, 702 F.3d 96, 101 (2d Cir. 2012) ("Fundamental unfairness arises when a fundamental procedural error is coupled with prejudice resulting from that error." (internal quotation marks and citation omitted)). The due process and prejudice elements of the fundamental unfairness showing must be closely connected, as "the defendant must link the actual prejudice he claims to have suffered to the specific due process violation at issue." United States v. Lopez-Collazo, 824 F.3d 453, 462 (4th Cir. 2016). Here, defendant's § 1326(d) challenge falls short on both fronts.

16

1.

Defendant identifies two due process defects in her expedited removal proceeding: immigration agents' alleged failure to provide "interpretive assistance" to translate key documents into Spanish for her, see 8 C.F.R. § 235.3(b)(2)(i) (1999), and to serve her with necessary documentation, see id. At the outset, the government argues that these alleged defects may not have actually occurred. The government points out, for instance, that defendant's argument rests on a self-serving and somewhat inconclusive statement in her affidavit, see Def.'s Mot. Ex. A [Dkt. No. 22-1] ¶ 7 ("I have no recollection of the officials translating any other forms for me."), and on an inference to be drawn from the lack of any certification about translation on the I-860 and I-296 forms she received, see Def.'s Mot. Ex. C [Dkt. No. 22-1]; Def.'s Mot. Ex. D [Dkt. No. 22-1]. The government further emphasizes that Sorges, the officer who conducted the expedited removal interview with defendant in Spanish and who prepared the I-867A form reproducing defendant's responses, also signed the two forms defendant claims might not have been translated for her. Relying on the general presumption "that public officers properly discharge their duties," Gov't's Opp'n 8 (quoting County of Del Notre v. United States, 732 F.2d 1462, 1468 (9th Cir. 1984)), the government argues that there is little reason to believe that Sorges would not have translated those documents for defendant as well. Likewise, the government points out that Sorges certified that he personally served the original I-860 form on defendant, arguing that mere "silen[ce]" in the record as to whether defendant received or signed the back of that form does not justify a finding of any violation. See id. at 9 (quoting Barajas-Alvarado, 655 F.3d at 1088 n.12); see also Def.'s Mot. Ex. A [Dkt. No. 22-1] ¶ 8 (defendant averring only that she does not "recall being asked to sign that form"). The government

maintains that defendant's assertions are too speculative to justify a ruling that her due process rights were violated.

Although many of the government's arguments are well made,[10] the Court need not definitively address them because of the fundamental disconnect between the defects defendant identifies and the harm she claims to have suffered. None of the immigration forms that defendant claims were not translated for, or provided to, her contains any advisement about withdrawing an application for admission or the effect of departing the country without a formal removal order. Nor has the defendant argued that she was entitled to such an advisement. Cf. United States v. Meraz-Olivera, 472 F. App'x 610, 612 (9th Cir. 2012) (per curiam) ("Neither the statute, nor the regulations, require that an immigration officer advise the alien of his opportunity to request withdrawal of his application for admission . . . ."). The most defendant can argue is that had she been informed of the formality and seriousness of the administrative process she was facing,[11] she would have voluntarily asked to withdraw. But she effectively did

---

[10] There are also reasons to doubt Terrazas Siles's credibility. Defendant's actions leading up to her encounter with immigration authorities—particularly her knowing use of false documentation in an effort to gain access to the United States—suggest a willingness to deceive public officials. Additionally, although she stated in her interview with Sorges that she had intended to stay in the country for only 10 days, when she returned to the United States the following year she ended up staying for 15 years. Further, defendant's status as a convicted felon to some extent undermines her credibility.

Yet the government's argument is not without defects. The presumption of regularity is a useful concept in many areas of administrative law but may be of limited utility here. Although agency decisionmaking bodies and high-level officers are often presumed to act in good faith and in accordance with applicable rules and regulations, the presumption does not apply with equal weight to low-level law enforcement officers. And in a context such as expedited removal, where the procedures governing immigration authorities and the rights to which noncitizens are due are so minimal, there is all the more reason to demand scrupulous compliance and accurate recordkeeping.

[11] Even that argument is seriously undercut by the fact that Sorges advised defendant, in Spanish, that she "d[id] not appear to be admissible or to have the required legal papers authorizing . . . admission to the United States"; that this could "result in [her] being denied admission and

make such a request, repeatedly informing immigration officials that she "just want[ed] to go home." Def.'s Mot. Ex. A [Dkt. No. 22-1] ¶ 9. At bottom, even assuming that defendant's expedited removal proceeding was defective, the defects alleged are divorced from any injury and accordingly do not support dismissal of the indictment.

2.

There is also no merit to defendant's argument regarding prejudice. Defendant claims that if she had better understood the law, she might have secured permission to withdraw her application for admission and to return home without a formal deportation order, which would have shielded her from future immigration and criminal consequences. Although she recognizes that under the INA there is no right to withdraw an application for admission, see 8 U.S.C. § 1225(a)(4) ("An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."), she submits that it was at least reasonably likely that she would have been permitted to withdraw.

Although defendant is required to show only a "reasonable probability" of a better result to challenge her underlying deportation proceeding, see El Shami, 434 F.3d at 665, she is wrong about how that law applies to the facts of her case. As discussed above, defendant repeatedly told immigration officials that she just wanted to return home, which is essentially a request for withdrawal of her application for admission. The most sensible reading of the evidence is that the immigration officials declined to give defendant the relief she was requesting—the same

---

immediately returned to [her] home country without a hearing"; and that if she were removed, she would "be barred from reentry for a period of 5 years or longer." Def.'s Opp'n Ex. 2 [Dkt. No. 23-1] 1.

relief she now claims she might have received. Even setting that fact aside, there are serious reasons to doubt whether immigration officials would have granted defendant permission to withdraw had she formally made such a request. The parties agree that when immigration officials encountered defendant in 1999, they would have looked to the Inspector's Field Manual in deciding whether to allow defendant to withdraw her application for admission. The Manual "instructs officers to 'consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice.'" See Raya-Vaca, 771 F.3d at 1207 (citation omitted). The Manual identifies six factors to be considered in making that determination: "(1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations." See id. (quoting Barajas-Alvarado, 655 F.3d at 1090). The Manual also makes clear that those factors are non-exhaustive and that others may be equally valuable. Most relevant here, the Manual states that "[a]n expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant." See Barajas-Alvarado, 655 F.3d at 1090 (citation omitted).

Defendant argues that it was at least reasonably likely she would have been granted permission to withdraw. In support, she highlights that she had no previous immigration offenses; that she was only 20 years old at the time; and that a meaningful percentage of all

20

inadmissible applicants are granted leave to withdraw.[12] Defendant ignores or discounts the most relevant factor: that (as she admits) she paid a "coyote" and knowingly attempted to use false documentation to gain access to the United States. Defendant's selective emphasis on one or two of the factors listed in the Inspector's Field Manual "carr[ies] little weight . . . in light of the Field Manual's emphasis on the disqualifying effect of 'obvious, deliberate fraud on the part of the applicant.'" Barajas-Alvarado, 655 F.3d at 1091 (citation omitted). In summary, the specific facts of defendant's case and the applicable regulatory guidance make it "implausible that [she] would have been allowed to withdraw," id.

Although there is some evidence in this case that immigration officials failed to comply with applicable regulations in processing defendant for expedited removal, that evidence is equivocal at best, and ultimately defendant has not shown that she was prejudiced by any of those defects. For those reasons, her § 1326(d) challenge must be rejected.

## IV.

In her final argument, defendant asserts that her apprehension at the border and the time she spent in federal immigration custody do not qualify as an "entry" for purposes of immigration and criminal law.[13] She argues that because she never "entered" the United States in 1999, she cannot be prosecuted for "reentry" now. This argument is based on a flawed reading of the statutory offense with which defendant has been charged.

---

[12] The government agrees that in fiscal year 1999, approximately 46% of inadmissible noncitizens who arrived at the border were permitted to withdraw rather than being placed in expedited removal. See Gov't's Suppl. Resp. 17.

[13] "As defined by the [Board of Immigration Appeals], 'entry' requires (1) a crossing into the territorial limits of the United States; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection; and (3) freedom from official restraint." De Leon v. Holder, 761 F.3d 336, 338 (4th Cir. 2014) (citing In re Pierre, 14 I. & N. Dec. 467, 468 (BIA 1973)).

Section § 1326(a) has two elements. The first requires a showing that the noncitizen "has been denied admission" to or was "excluded, deported, or removed" from the United States. 8 U.S.C. § 1326(a)(1). The second requires that the noncitizen "enter[], attempt[] to enter, or [be] at any time found in . . . the United States" without the requisite prior official consent. Id. § 1326(a)(2). In any prosecution under § 1326(a), the government must prove "the defendant's prior removal" before the subsequent entry. United States v. Moreno-Tapia, 848 F.3d 162, 165 (4th Cir. 2017). Contrary to defendant's argument, there is no "entry" requirement in the first element of § 1326(a); rather, all that is necessary is that the defendant was "denied admission" or "removed." Cf. Moreno-Tapia, 848 F.3d at 165 (observing that "[t]ypically, the government may rely on the removal order itself" to satisfy its burden under § 1326(a)(1)). In effect, defendant attempts to use § 1326(a)'s title, which uses the term "reentry," to revise the first element of the offense to require a prior entry. But it is the statutory language, and not the statutory provision's title or popular name, that controls. See Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947) (discussing the "wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text"). Given the clarity of the statutory language, it is unsurprising that defendant has not cited, and research has not revealed, any case law adopting the interpretation of the statute she urges. Indeed, defendant seems to have largely abandoned the argument. Compare Def.'s Mot. 1 (urging dismissal "for three independent reasons"), with Def.'s Suppl. 1 (asserting only "two primary" arguments: the statute of limitations and fundamental unfairness). Accordingly, defendant's final argument fails.

V.

For the reasons stated in open court and as elaborated above, defendant's Motion to
Dismiss the Indictment will be denied by an appropriate Order to be issued with this
Memorandum Opinion.

Entered this 5th day of July, 2019.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge